David C. Kresin (019858)
YEN PILCH ROBAINA & KRESIN PLC
6017 North 15th Street
Phoenix, Arizona 85014
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
dck@yprklaw.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Jeanne Finnegan, an individual, | No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| State Farm Mutual Automobile Insurance Company, a corporation, | (Jury Trial Demanded) |
| Defendant. | |

Plaintiff Jeanne Finnegan, by and through her counsel, alleges as follows:

1.     Plaintiff Jeanne Finnegan is an adult female residing in Maricopa County, Arizona.

2.     Defendant State Farm Mutual Automobile Insurance Company ("State Farm") is a corporation that conducts business in the State of Arizona.

3.     This action is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

4.     This Court has jurisdiction over the claims in this case under 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(f)(3)), and 28 U.S.C. §§ 1331.

5.     Jurisdiction and venue are appropriate in this Court.

6.     Finnegan began her employment with State Farm on approximately February 16, 1987.

7.     Finnegan was an outstanding and faithful employee to State Farm for over three decades.

8.     For approximately 25 years, Finnegan has suffered from migraine headaches.

9.     In October 2018, David Steele because Finnegan's Section Manager and Sondra Siler because Finnegan's Team Manager.

10.    After moving under Siler's management, Finnegan's chronic migraine headaches increased in number and severity.

11.    To treat the migraine headaches, Finnegan takes medications that slow her thinking, impair her concentration and attention, and otherwise limit her cognitive functions.

12.    The migraine headaches and medication substantially limit Finnegan's ability to see, sleep, think critically, concentrate, multitask, communicate, interact with others, and engage in cognitive functions.

13.    After the limitations became worse, Finnegan began requesting an accommodation of her disability to allow her to perform the essential functions of her job.

14.    Recognizing her own limitations, Finnegan submitted a request for reasonable accommodations under the ADA on approximately November 7, 2018. Finnegan requested "additional time when needed to complete job responsibilities and tasks" and to bring her work home to complete after her normal work hours.

15.    With the accommodation request, Finnegan provided documentation from her medical provider explaining the disabling impact of the migraine headaches and her medications for the headaches.

16.    Later that month, Siler informed Finnegan that although Human Resources had approved the accommodations, State Farm would not provide the accommodations. No alternatives were proposed or explored with Finnegan.

17.    In December 2018, Siler gave Finnegan a disciplinary memo criticizing her for the very deficits that she and her medical provider had informed State Farm were directly related to her disability and side effects of medications taken for her disability.

18.     In March 2019, Finnegan requested an accommodation transfer to a new team that was being created to answer coverage questions from agents all day; Siler denied the request based on the disability-related performance issues.

19.     After unsuccessfully trying to fix the disability-related performance issues without an accommodation, Finnegan received another disciplinary memo on March 25, 2019 regarding the same issues and threatening her employment if she did not correct the disability-caused deficits within 30 days.

20.     Ironically, after ignoring her prior request for accommodations, State Farm offered to provide an accommodation, if necessary, in the March 25, 2019 memo, recognizing that the performance issues were related to her disability.   And in the meeting to discuss the March 25 memo, Siler told Finnegan that she may want to revisit the ADA route because termination was likely on April 25, 2019.

21.     On March 28, 2019, Section Manager David Steele told Finnegan that Human Resources had recommended Finnegan seek ADA accommodations.  In response, Finnegan asked about the possibility of a transfer and Steele told Finnegan that she should apply through the normal solicitation process.

22.     As a result of the severe stress, depression and anxiety caused by State Farm's disregard of her rights under the ADA and her treatment in the workplace, Finnegan went out on a medical leave in early April 2019.

23.     Finnegan's FMLA leave entitlement expired on Monday, July 1, 2019 and Ms. Finnegan was scheduled to return to work at that time.

24.     Accordingly, on June 28, 2019, Finnegan through counsel again requested a reasonable accommodation to allow her to perform the essential functions of her job.

25.     Specifically, at that time, Finnegan proposed the following potential accommodations and asked State Farm to engage in the interactive process: (a) A brief extension of Finnegan's medical leave while State Farm considers her proposals and any other accommodations resulting from the interactive process; (b) Additional time at work to perform the required tasks of her job; (c) The opportunity to work from home as

needed to complete the required tasks; and/or (d) If necessary, reassignment to an equivalent, vacant position in which Finnegan can perform the essential functions of the job with fewer accommodations.

26.     At the time Finnegan proposed the accommodations, she knew there were equivalent, vacant positions in the fire and casualty department, for which she could perform the essential functions of the job.

27.     Each time she requested an accommodation, Finnegan explained that she needed the accommodation to be able to perform the essential functions of her job.

28.     Each time, State Farm denied the request for reasonable accommodation.

29.     After the June 28, 2019 request, when Finnegan returned to the office on July 1, Siler sent Finnegan home and told her that State Farm would not work directly with her on the accommodation because she had counsel involved.

30.     Subsequently, State Farm sent a letter to Finnegan's counsel, indicating that a company representative would reach out to Finnegan directly to "discuss her requests for an accommodation" because "it is State Farm policy to continue to work directly with all current State Farm employees."

31.     By July 19, Finnegan had still received no communication from State Farm to engage in the interactive process or identify or provide reasonable accommodations. The only communication she received was her manager Siler asking if she would be returning to work on July 22.

32.     On July 19, Finnegan emailed Siler indicating that she would be able to return to work on July 22 if State Farm could provide some of the accommodations referenced in the June 28 letter.  She also indicated that without a reasonable accommodation, she would be unable to return to work that day.

33.     Later that day, Siler left a voicemail message to Finnegan indicating State Farm would not allow her to work from home but would allow her one extra hour per business day for a month.  Siler ignored the proposed transfer.

34.     Because State Farm refused to engage in the interactive process or provide any long-term accommodations, Finnegan stayed on leave until October 5, 2019—the full extent of her available short-term disability leave.  Then, she returned to work.

35.     Upon her return, State Farm notified her that it would not provide the opportunity to work from home because she remained on the performance improvement discipline from March 2019—discipline that was directly related to and resulting from her disability and the effects of her medication.  State Farm informed Finnegan she could not transfer to another position for the same reason.

36.     Throughout that time, equivalent, vacant positions remained available, at least in the fire and casualty department.

37.     From her return in October 2019 through December 2019, State Farm allowed Finnegan and all other claim representatives to work extra hours to help manage their caseloads.  That extra time was not an accommodation of her disability as State Farm allowed all employees additional time to do the job during that timeframe.

38.     After Finnegan returned to work, State Farm treated her worse than other employees: while the company made efforts to adjust and balance other employees' workloads and encourage co-workers to help each other, it did not adjust or balance Finnegan's workload and refused to allow co-workers to help her.

39.     By December 2019, the equivalent, vacant positions in fire and casualty had all been filled. Not coincidentally, at that time, State Farm expressed a willingness to help Finnegan find a new position within the company.

40.     State Farm, however, insisted that it would only assist Finnegan in finding a new position if: (1) Finnegan left her current position immediately and began using her paid leave allotment; (2) if Finnegan ran out of leave before she found a position, her employment would end; and (3) if a new open position was identified, Finnegan would be required to apply and go through the usual recruitment/interview process to obtain the position.

41.     Siler, Steele, and the Human Resources representative all told Finnegan that she must give up her current position prior to finding a new position.  This was an obvious effort to end Finnegan's employment; accordingly, Finnegan declined to leave her current position without securing another position first.

42.     Finnegan tried to continue performing her job without any reasonable accommodations from State Farm.

43.     On January 28, 2020, Finnegan emailed Siler and Steele to notify them that she was filing an EEOC charge of disability discrimination and related retaliation because State Farm had violated her rights under the ADA.

44.     On approximately February 14, 2020, Siler provided Steele with a memo recommending termination of Finnegan's employment and falsely claiming that State Farm had repeatedly engaged in the ADA interactive process and that Finnegan had refused accommodation offers.

45.     State Farm and Siler understood the alleged performance deficiencies asserted by State Farm were a direct result of Finnegan's disability and the medications related to her disability.

46.     Throughout her employment, Finnegan continued to express her willingness to cooperate in the interactive process in hopes of finding an acceptable reasonable accommodation that would allow her to perform the essential functions of her job, but State Farm refused to accommodate Finnegan's disability.

47.     On February 24, 2020, State Farm terminated Finnegan's employment.

48.     On March 9, 2020, Finnegan filed a timely charge of discrimination with the EEOC.

49.     Finnegan received her notice of right to sue from the EEOC after January 30, 2021.

50.     Finnegan has met all administrative prerequisites for the bringing of this lawsuit.

51.     As a result of State Farm's conduct, Finnegan has suffered and continues to suffer lost income, lost fringe benefits, medical expenses, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

52.     State Farm's conduct toward Finnegan and her disability was consistent with its pattern of treating other similarly situated employees.

### COUNT ONE
### (Failure to Accommodate in violation of the ADA)

53.     Finnegan incorporates by reference all previous allegations as though set forth fully herein.

54.     At all relevant times, State Farm has been an employer subject to the ADA and not exempt from its requirements.

55.     At all relevant times, Finnegan was an employee under the ADA.

56.     From at least 2018 through the end of her employment with State Farm, Finnegan was an individual with a disability under the ADA in that she had a mental or physical impairment that substantially limited one or more major life activities.

57.     At all times during her employment with State Farm, Finnegan was qualified under the ADA in that she could perform the essential functions of her job with or without a reasonable accommodation.

58.     At all relevant times, State Farm knew of Finnegan's disability.

59.     Finnegan requested reasonable accommodations for her disability including additional time at work to perform the required tasks of her job, the opportunity to work from home as needed to complete the required tasks, and/or reassignment to an equivalent, vacant position.

60.     None of the accommodations requested by Finnegan were an undue hardship to State Farm's business.

61.     State Farm failed to engage in the interactive process to determine whether State Farm could provide a reasonable accommodation to Finnegan's disability.

62.     At all relevant times, State Farm refused to provide Finnegan with a reasonable accommodation of her disability.

63.     State Farm's conduct described above was undertaken with malice or reckless indifference to Finnegan's rights under the ADA; accordingly, Finnegan is entitled to an award of punitive damages against State Farm.

**COUNT TWO**
**(Disability Discrimination in violation of the ADA)**

64.     Finnegan incorporates by reference all previous allegations as though set forth fully herein.

65.     State Farm discriminated against Finnegan due to her disability in violation of the ADA by among other things by refusing to engage in the interactive process with Finnegan, failing to accommodate Finnegan's disability, issuing disciplinary memos to Finnegan based on disability-caused deficiencies, denying Finnegan the same opportunities as other employees due to her disability, terminating Finnegan's employment relationship, and by otherwise subjecting Finnegan to differing terms and conditions of employment.

66.     State Farm's conduct described above was undertaken with malice or reckless indifference to Finnegan's rights under the ADA; accordingly, Finnegan is entitled to an award of punitive damages against State Farm.

**COUNT THREE**
**(Illegal Retaliation in violation of the ADA)**

67.     Finnegan incorporates by reference all previous allegations as though set forth fully herein.

68.     State Farm retaliated against Finnegan in violation of the ADA by terminating Finnegan's employment relationship in retaliation for Finnegan seeking reasonable accommodations and otherwise asserting her rights under the ADA.

69.     State Farm's conduct described above was undertaken with malice or reckless indifference to Finnegan's rights under the ADA; accordingly, Finnegan is entitled to an award of punitive damages against State Farm.

70.     Finnegan demands a jury trial on all claims and issues set forth herein.

71.     Finnegan is entitled to recover her attorneys' fees under the above claims.

WHEREFORE, Plaintiff Jeanne Finnegan prays for judgment against Defendant State Farm Mutual Automobile Insurance Company as follows:

A.     For an award of economic damages in an amount sufficient to make Finnegan whole for past and future lost income and benefits and other economic losses suffered by Finnegan resulting from State Farm's conduct;

B.     For an award of compensatory damages for mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation, loss of enjoyment of life and other losses incurred by Finnegan as a result of State Farm's conduct;

C.     For an award of punitive damages;

D.     For an award of attorneys' fees and related expenses;

E.     For an award of prejudgment and post-judgment interest;

F.     For an award of Finnegan's costs of suit incurred herein; and,

G.     For an award of such other relief as the Court may deem just and proper.

DATED this 28th day of April, 2021.

YEN PILCH ROBAINA & KRESIN PLC


By /s/David C. Kresin
David C. Kresin
Attorneys for Plaintiff Jeanne Finnegan